

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00275-CV

_____

IN RE: THE COMMITMENT OF DERRICK JACKSON

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. D396-S-14612-20

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Derrick Jackson appeals from a civil-commitment order that was rendered after a jury found him to be a sexually violent predator (SVP). In two issues, Jackson challenges the sufficiency of the evidence supporting the jury's verdict. Because we hold that the evidence is legally and factually sufficient to support the SVP finding, we will affirm the trial court's civil-commitment order.

## I. Background

The State filed a petition to civilly commit Jackson as an SVP. Jackson had twice pleaded guilty to, and been convicted of, indecency with a child by contact, a sexually violent offense. *See* Tex. Health & Safety Code § 841.002(8)(A). According to the State, Jackson committed the first offense in 1996 and the second in 2012.

Two witnesses testified at the jury trial: Jackson and the State's expert, Dr. Darrel Turner. Dr. Turner opined that Jackson suffers from a behavioral abnormality that causes him to be an SVP. While Jackson admitted that he had committed the predicate offenses, he testified that he was no longer sexually attracted to children and that he would never touch another child again.

The jury found beyond a reasonable doubt that Jackson is an SVP. The trial court then ordered Jackson civilly committed until he is no longer likely to engage in predatory acts. This appeal followed.

2

## II.  The Law on Civil Commitment

At a trial on a State's petition seeking civil commitment, "[t]he judge or jury shall determine whether, beyond a reasonable doubt, the person is [an SVP]."  *Id.* § 841.062(a).

A person is an SVP if that person "(1) is a repeat sexually violent offender[] and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence."  *Id.* § 841.003(a)(1), (2).  "Behavioral abnormality" has a statutory definition: "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person."  *Id.* § 841.002(2).

## III.  The Record Before Us

In addition to the two witnesses' testimony, the evidence at trial consisted of four exhibits: Dr. Turner's curriculum vitae, two penitentiary packets containing the judgments from Jackson's prior indecency cases, and a handwritten statement made by Jackson in his first case.

### A.  Dr. Turner's Testimony

According to Dr. Turner, there is no test that can definitively determine whether someone has a behavioral abnormality.  Accordingly, when Dr. Turner conducts civil commitment evaluations, he studies an individual's pertinent records, interviews the individual, and conducts testing and reviews the results to indicate

whether a person will reoffend. Dr. Turner testified that the methodology he uses accords with his training as a forensic psychologist and is within the accepted standards in the field of forensic psychology. Dr. Turner explained that his job as a forensic evaluator is to provide expert testimony to help the factfinder, in this case the jury, in reaching its decision.

Prior to interviewing Jackson, Dr. Turner reviewed Jackson's pertinent records, including his previous parole interviews, other interviews that he had given with sex-offender treatment providers, prison records, court documents, police investigations, offense statements, victim statements, and previous statements made by Jackson. Dr. Turner then prepared a report concluding that Jackson suffers from a behavioral abnormality. Months later, Dr. Turner interviewed Jackson by telephone. After this interview, Jackson gave a deposition to the Special Prosecution Unit, and Dr. Turner reviewed that along with Jackson's treatment records.[1]

## 1. Interview

Dr. Turner spoke with Jackson for about two hours.[2] During the interview, they discussed Jackson's childhood, sexual history, and criminal history. Jackson

---

[1]Dr. Turner testified that Jackson at first refused to participate in the evaluation, "which is absolutely his right," so Dr. Turner prepared a report based on the record review. Jackson later agreed to participate in an interview, and Dr. Turner interviewed him by phone for two hours. Dr. Turner testified that his opinion remained the same with the additional information he received in the interview.

[2]Dr. Turner testified that this is a typical length for one of these interviews.

admitted having committed the two indecency offenses for which he was convicted, as well as another offense against a different girl.[3] Dr. Turner testified that he thought Jackson had lied to him "about some things but not about other things." Turner diagnosed Jackson as having pedophilic disorder nonexclusive type,[4] adult antisocial behaviors, and cannabis-use disorder in full remission.

## 2. History of Sexual Offenses

Dr. Turner discussed Jackson's sexual offense history during their interview. Based on the records Dr. Turner reviewed, Jackson committed his first offense in 1996. The child victim was four years old at the time, and Jackson fondled her vagina "on multiple occasions." The first time, he fondled her vagina and buttocks over her clothes. The second occasion, he fondled her vagina underneath her clothing and also fondled her buttocks again. The child victim also alleged that Jackson had forced her to fondle his penis. Jackson denied that outright but claimed that she had climbed into bed with him when he was sleeping and had started playing with his penis, and he woke up and made her stop immediately. After Jackson pleaded guilty to the charge

---

[3]Jackson admitted to molesting a 12-year-old relative after committing his first offense but before he was apprehended and convicted for it. Jackson told Dr. Turner that he had harbored plans to continue touching his first victim, but then he ended up in a relationship with an adult and moved to California, where he molested his second victim. Dr. Turner testified that Jackson "was touching her underneath a blanket [when] her mother walked in." Dr. Turner explained, "[I]t was a similar MO to the other offenses."

[4]Dr. Turner explained that this means that Jackson is attracted to adult females and female children but not male children.

of indecency with a child, the trial court sentenced him to six years in prison.

In 2012, after Jackson was released from prison, he began sexually abusing his third victim, another relative. She was eight years old at the time; Jackson was 38. He admitted to fondling her vagina over her clothes and touching her bottom "on two occasions," but the victim claimed that it had happened at least five times. According to the records that Dr. Turner reviewed, Jackson told the victim that her mother believed him more than she believed her and that, if she told, then he would spank her very hard, and her mother would not want to be her mother anymore. Jackson denied making these statements and threats. He pleaded guilty to indecency with a child in that case and consequently received a ten-year prison sentence.

Dr. Turner further testified to a number of similarities between Jackson's first and third offenses (the two for which he was caught, convicted, and imprisoned). In each case, Jackson recognized an attraction to his victim and planned to touch her before actually touching her. He felt an "exhilaration" when he committed the offenses but was also concerned that he could go to jail.[5] Jackson also admitted to being under the influence of both alcohol and marijuana at the time of all three sex

---

[5]In the case of the third victim specifically, Dr. Turner said that Jackson had described feeling

> not just concern but actual fear because he had already been to prison at this point[, s]o it wasn't just concern that he might go to jail[;] he had an actual fear that he was going to return to prison, yet he continued to not only sexually offend against her but sexually offend against her multiple times.

offenses. Dr. Turner testified that, "from research[,] we know that offenders who offend while under the influence of substances are at an increased risk to reoffend."

### 3. Psychological Tests

As a part of Jackson's evaluation, Dr. Turner administered two tests commonly used by psychologists when conducting behavioral-abnormality evaluations—the Psychopathy Checklist Revised test (PCL-R) and the Static-99R test.

The PCL-R test helps to assess the level of someone's psychopathy. Dr. Turner explained that a PCL-R test score will range from 0 to 40 and that the average adult male with no criminal history would score between a 5 and an 8. A score of 26 to 30 would indicate a high degree of psychopathy, and a score of 31 to 40 would indicate a severe degree of psychopathy. Jackson scored a 22.

Dr. Turner testified that a 22 is about what an "average inmate" would score on the test but that it is "higher than most offenders who only have child victims." Dr. Turner clarified that he "would not call Mr. Jackson a psychopath." But Dr. Turner said that Jackson "does have an elevated degree of psychopathic traits" and that his PCL-R score was "evidence of antisociality enough that it's also a concern in a behavioral abnormality evaluation." Dr. Turner specifically pointed to Jackson's "grooming" of his most recent victim as an example of "conning and manipulative behavior" and to Jackson's blaming another incident of sexual contact (with his first victim) on the victim, an attitude that Turner said evinced "a callousness and a lack of empathy."

7

Dr. Turner also administered the Static-99R test to Jackson. The Static-99R test is a statistics-based actuarial risk assessment that assesses how likely a person is to be arrested or convicted for a sexual offense. Jackson scored a 2 on the test, a score that, according to Dr. Turner, "puts him in an average range of risk as compared to other sex offenders." A score of 2 on the Static-99R translates to a 5.6 percent predicted recidivism rate with "the routine sample," according to Dr. Turner. However, Dr. Turner further testified that he believed that Jackson's Static-99R score would have been the same when he was first released in 2004, and yet he reoffended after that release.

### 4. Risk Factors of Reoffending

Dr. Turner testified that he also considered Jackson's "risk factors." "Risk factors" are characteristics that, when possessed by a sex offender, indicate that the sex offender is more likely to reoffend than other sex offenders. Dr. Turner testified that the "two biggest risk factors that we're looking at on whether someone is going to reoffend sexually" are (1) does he have a sexually deviant interest, and (2) is he antisocial? He went on to explain that "when you have sexual deviance and you have antisociality, . . . there is an exponential increase, like nine times the likelihood of reoffending, in those sex offenders than when you don't have both of those together," and Jackson has both of those conditions. Dr. Turner cited several other facts that he identified as risk factors, including Jackson's

- Reoffending after he was caught and punished for his first offense;

8

- Being under the influence of substances while he offended;

- Committing an additional offense for which he was not adjudicated and for which he did not count the victim among his victims;[6]

- Failing to grasp an "overall understanding of what he ha[d] learned in treatment," indicating that Jackson does not really understand why he offends and what drives his offending; and

- Committing another sex offense after he had completed a sex-offender treatment following his first conviction.

Dr. Turner also explained that he had considered certain "protective" factors. In contrast to risk factors, "protective" factors are variables that either lower someone's risk of reoffending or keep it from increasing. Dr. Turner testified that Jackson's realistic release plans; aging;[7] PCL-R and Static-99R scores; and lack of male victims, nonsexual criminal history, and significant psychiatric history were all protective factors. But, ultimately, Dr. Turner characterized Jackson's risk of reoffending as "[h]igh . . . because of the risk factors that he has."

---

[6]Dr. Turner appears to have contradicted himself when he testified that "[t]he fact that [Jackson] has an additional offense for which he was not adjudicated *that he doesn't count among his victims, even though he admitted to me that he did molest her*, is a risk factor [that is] not accounted for on the Static[-99R test]."(emphasis added) We will address conflicts in the evidence in our analysis.

[7]Dr. Turner testified that research shows that a person is less likely to offend as he ages. However, he later clarified that age "starts to become most protective when it's like 60 or above;" thus, Dr. Turner did not give "much protective weight" to Jackson's age (47 at the time of trial) when he had committed his last offense at age 38.

## B. Jackson's Testimony

After Dr. Turner testified, the State called Jackson as an adverse witness. Jackson testified that he was molested between the ages of five and 12. He began smoking marijuana "around age 12" and drinking alcohol at age 15. He agreed that he had a problem with marijuana but insisted that his drinking was not "much" of a problem because he was "not an addict" and had "quit already." He quit both marijuana and alcohol the day he was arrested in 2012.

Jackson admitted to sexually offending against all three child victims but maintained that he had not sexually offended against any other children. He testified that he had one disciplinary write-up (for masturbation) during his first prison term but none during his current term. He also denied having any history of mental health problems or ever being on medication for any mental health problems.

According to Jackson, he registered as a sex offender after he was released from prison in 2004, but he did not complete the required sex-offender treatment program, elaborating that he had "probably" attended the treatment class no more than three times in five months. He claimed to have learned nothing from the treatment classes and attributed his reoffending to not receiving a proper treatment program.[8]

At the time of trial, Jackson was participating in a nine-month treatment

---

[8]Jackson described the class as "[j]ust going and say[ing] what your offense was and your victim's age, and that was basically it."

program in prison. He discussed what he had learned through education and group therapy and told the jury that he would control his sexual urges when released from prison by using "everything [he had] learned in therapy." He explained that he had people he could call or that he could "just leave the room" if he found himself alone with anybody under age 17. He also said that he had learned about empathy. As he put it, "I knew what sympathy was, but I didn't know the meaning of empathy. And empathy is putting myself in the victims' shoes. Seeing exactly what they said or feeling what they felt, the heartache, the pain, just the torment of everything that I did, I can see it."

Jackson testified about other programs that he had completed while in prison—programs that taught him "life skills, people skills," and job skills, including how to bake.

According to Jackson, his sexual desire went away in 2014 when he gave his life to God. He completed a Bible study, and before the COVID-19 pandemic, he went to church every Sunday. Jackson said that he did not think that he was at risk to sexually reoffend, nor did he believe that he would need any further treatment to keep from reoffending after he finished the classes in his then-current treatment program. He stated that he "would never touch another kid ever" again. However, he also admitted that he had thought the same thing the first time he was released from prison.

## IV. Sufficiency of the Evidence

In his first and second issues, Jackson argues that the evidence is legally and factually insufficient to support the jury's SVP finding. Because we hold that the evidence is legally and factually sufficient, we overrule Jackson's first and second issues.

### A. Legal Sufficiency

We review SVP civil commitment proceedings for legal sufficiency of the evidence using the appellate standard of review applied in criminal cases. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674-75 (Tex. 2020). We assess the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the statutory elements required for commitment beyond a reasonable doubt. *Id.* It is the jury's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *In re Commitment of Mullens*, 92 S.W.3d 881, 887 (Tex. App.—Beaumont 2002, pet. denied).

Jackson's legal sufficiency issue attacks Dr. Turner's expert witness testimony, which Jackson says "contained unsupported conclusions, unwarranted assumptions and factual errors that rendered it unreliable." Without Dr. Turner's unreliable opinion, Jackson argues, no reasonable jury could have found him to be an SVP because he was not shown to be so likely to offend that he "constitute[d] the type of menace" that the Constitution permits to be deprived of his liberty.

Opinion testimony that is wholly conclusory or speculative amounts to no evidence "because it does not tend to make the existence of a material fact 'more probable or less probable.'" *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009) (quoting *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004)). Thus, "[b]are, baseless opinions will not support a judgment even if there is no objection to their admission in evidence." *Id.* "When a scientific opinion is admitted in evidence without objection, it may be considered probative evidence even if the basis for the opinion is unreliable." *Id.* at 818. "But if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *Id.*

Much of Jackson's argument for his legal sufficiency issue challenges the methodology that Dr. Turner used in formulating his opinion. Jackson complains that Dr. Turner's opinion was not based on "statistical evidence scientifically supporting his recidivism prediction" or on "data that supports his conclusions." Jackson, however, never objected to Dr. Turner's opinions during trial on the basis that his opinions were unreliable.[9] Therefore, he must show that Dr. Turner's

---

[9]Jackson analogizes Dr. Turner's testimony to that of a forensic psychiatrist who testified in a capital murder trial. *See Coble v. State*, 330 S.W.3d 253, 270 (Tex. Crim. App. 2010). *Coble* concerned a challenge to the reliability of the methodology underlying the expert's opinion that occurred at the trial court level. *Id.* at 279–80. Jackson did not raise a challenge of this type in the trial court; thus, *Coble* is inapposite.

opinion is conclusory, i.e., there is no basis to support his opinions, to prevail on his legal sufficiency challenge. *See id.* at 817; *In re Commitment of Barbee*, 192 S.W.3d 835, 843 (Tex. App.—Beaumont 2006, no pet.).

According to the record, Dr. Turner is licensed in his field. *See In re Commitment of Burnett*, No. 09-09-00009-CV, 2009 WL 5205387, at *5 (Tex. App.—Beaumont Dec. 31, 2009, no pet.) (mem. op.). He interviewed Jackson; conducted risk assessments; and reviewed records regarding Jackson's background, offenses, and incarceration. *See id.* Further, Dr. Turner administered actuarial tests, and he testified that his overall evaluation of Jackson was performed in accordance with the accepted standards in the field of forensic psychology. Dr. Turner detailed the facts and evidence that he found relevant in forming his opinion and how those facts had played a role in his evaluations. *See id.* According to Dr. Turner, he relied on the types of records that are relied on by experts in his field, and he performed his evaluation in accordance with his training as a professional in his field. *See id.*

Jackson complains on appeal about the "subjectivity" of Dr. Turner's opinion and the data underlying it. However, Dr. Turner explained at trial why his opinion is not subjective:

> [M]y opinion is based on, as I said, looking at risk factors and protective factors in a case, and those come from research, research that is conducted, that is peer-reviewed, that is published, that is accepted in the

*Id.*; *see In re Commitment of Crosby*, No. 09-11-00371-CV, 2012 WL 983168, at *1–2 (Tex. App.—Beaumont Mar. 22, 2012, pet. denied) (mem. op.).

14

field of psychology and psychiatry. So it's not subjective in the sense that I go in and just say whatever I want to say. It is more objective in the sense that I'm looking at variables and factors that are supported by scientific research.

The evidence at trial also belies Jackson's arguments that Dr. Turner "denigrated and downplayed" evidence that did not support his opinion and "fail[ed] to consider facts and alternatives that r[a]n counter to his analysis." Dr. Turner testified as to both Jackson's risk factors *and* his protective factors and stated that he had considered both in formulating his opinion. To the extent that Dr. Turner's opinion conflicted with other facts in evidence—or that his opinion was based on conflicting facts in evidence—these were conflicts for the jury to resolve, and we defer to that resolution. *See Petetan v. State*, 622 S.W.3d 321, 337, 349 (Tex. Crim. App. 2021); *Mullens*, 92 S.W.3d at 887 (stating that the jury may resolve conflicts and contradictions in the evidence).

We conclude that the record provides support for Dr. Turner's opinions. Consequently, his opinions cannot be characterized as wholly conclusory, speculative, or without foundation. *See Pollock*, 284 S.W.3d at 817; *Coastal Transp. Co.*, 136 S.W.3d at 233; *see also Barbee*, 192 S.W.3d at 843.

Jackson further argues that the verdict is legally insufficient because there is little to no evidence supporting a conclusion that he cannot control his sexual impulses, if he does indeed still have them. The United States Supreme Court has held that due process requires "proof of serious difficulty in controlling behavior"

before a person can be civilly committed as an SVP. *Kansas v. Crane*, 534 U.S. 407, 413, 122 S. Ct. 867, 870 (2002); *see also In re Commitment of Mares*, 521 S.W.3d 64, 67 (Tex. App.—San Antonio 2017, pet. denied). A jury's verdict that someone is an SVP—which necessarily includes a finding that the person suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence—encompasses the determination required under *Crane*. *See* Tex. Health & Safety Code Ann. § 841.003(a); *Mares*, 521 S.W.3d at 67.

While we disagree with the State that Jackson's arguments "are an attempt to discount the impact of his offenses without any supporting legal authority," we do agree that the record contains ample evidence to support the jury's implicit finding that Jackson has serious difficulty controlling his behavior. Jackson himself admitted this very fact on the witness stand, and Dr. Turner repeatedly explained how suffering from a behavioral abnormality relates to difficulty controlling behavior. Viewing the evidence in the light most favorable to the verdict, we hold that a rational jury could have found, beyond a reasonable doubt, that Jackson is a repeat sexually violent offender[10] and that he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See* Tex. Health & Safety Code Ann.

---

[10]Jackson frames his two appellate issues as general attacks on the jury's verdict that he is an SVP, but the substance of his arguments goes only to the second element—that he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. At any rate, the evidence also supports the jury's finding that Jackson is a "repeat sexually violent offender" as defined by the SVP Act. *See* Tex. Health & Safety Code Ann. § 841.003(b).

§§ 841.002(2), .003(a); *In re Commitment of Almaguer*, 117 S.W.3d 500, 506 (Tex. App.—Beaumont 2003, pet. denied). In other words, we conclude that the evidence is legally sufficient to support the jury's finding that Jackson is an SVP. *See* Tex. Health & Safety Code Ann. §§ 841.003(a), .062; *Mullens*, 92 S.W.3d at 885. We overrule Jackson's first issue.

## B. Factual Sufficiency

The Texas Supreme Court recently clarified the standard governing a factual sufficiency review in the rare civil cases in which the burden of proof is beyond a reasonable doubt, like cases brought under the SVP Act. *See Stoddard*, 619 S.W.3d 665. When reviewing the factual sufficiency of the evidence to support a civil commitment, we are to determine whether, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of the verdict, along with undisputed facts contrary to the verdict, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met. *Id.* at 678.

Jackson makes several arguments to support his claim that the evidence is factually insufficient to support the jury's SVP finding. He points us to the following "undisputed facts contrary to the verdict": (1) Jackson is not a psychopath and does not have antisocial personality disorder; (2) his score on the Static-99 puts him in an "average risk" category; (3) he did not use violence in his offenses, or he committed "non-sexually violent crimes" ; (4) he had no sexual disciplinary convictions during his

17

most recent period of incarceration; and (5) he assaulted female family members, but the assaults were many years apart. These facts do not render the evidence factually insufficient to support the jury's SVP finding for several reasons.

First, Jackson presents no authority to support his position that the evidence is insufficient to support the jury's finding because he was not diagnosed with an antisocial personality disorder nor determined to be a psychopath. *See In re Commitment of Hutyra*, No. 14-17-00669-CV, 2018 WL 3911136, at *6 (Tex. App.—Houston [14th Dist.] Aug. 16, 2018, no pet.) (mem. op.); *see also In re Commitment of H.L.T.*, 549 S.W.3d 656, 660 (Tex. App.—Waco 2017, pet. denied) ("The only part of the SVP statute that calls for psychopathy testing is [S]ection 841.023(a), which applies only to the expert retained to assist TDCJ in its determination of whether to refer the person to the attorney for the State."). Although a medical diagnosis of a person's mental health may inform an assessment of whether that person has such a behavioral abnormality, determining whether a person suffers from a predisposing condition does not rest solely on such a diagnosis. *See In re Commitment of Bohannan*, 388 S.W.3d 296, 306 (Tex. 2012).

Regarding Jackson's score on the Static-99R test, this test considers risk factors for sexually reoffending and uses them to assess the relative risk of recidivism. *Hutyra*, 2018 WL 3911136, at *6. Dr. Turner stated that the Static-99R test does not, however, test for a behavioral abnormality and that "there are some serious flaws with it." Dr. Turner explained that the Static-99R test is based on group statistics, and if an

18

offender is released and re-offends but the new offense goes undetected, "as do most sexual offenses," then that recidivism would not show up on an instrument like the Static-99R test. Thus, this particular test "grossly underestimate[s] the likelihood of reoffending." Furthermore, Dr. Turner testified that the Static-99R test does not take into account certain risk factors that are pertinent to a determination of a risk to reoffend. Indeed, Turner testified that neither of the two biggest risk factors in this case—Jackson's degree of antisociality and his level of sexual deviance—are accounted for in the Static-99R.[11]

Next, Jackson's claim—"that he had not used violence in his offenses or

---

[11]In his brief, Jackson argues that "Dr. Turner cited risk factors [including antisociality and deviance] that are included in the Static[-99R test] and falsely told the jury that they were not." We can see from the record where some of the factual bases for Jackson's score on the Static-99R (as scored by Dr. Turner) conflict with, or are unsupported by, other evidence at trial. Even if a reasonable factfinder could not have resolved these conflicts in favor of the SVP finding, that would only further detract from the probative value of Jackson's Static-99R test results. Jackson appears to find himself in the difficult position on appeal of trying to discredit the Static-99R (as scored in this case) while at the same time contending that his "average" score on this test is evidence so significant that a reasonable jury could not have found beyond a reasonable doubt that he is an SVP. *See Stoddard*, 619 S.W.3d at 668 (standard for finding evidence factually insufficient).

Additionally, we note that it would have been helpful for this court's review if either party had made a record at trial of specifically which "ten variables" the Static-99R test takes into account and exactly how the score is calculated. A complete, detailed record would better equip us to assay whether or not the jury could reasonably have credited the Static-99R evidence in favor of its verdict. Based on the record before us, we cannot say that Jackson's score of 2 on the Static-99R, which Dr. Turner testified "put[] him in an average range of risk as compared to other sex offenders," is so significant as to render the evidence factually insufficient to support the jury's SVP finding.

19

committed non-sexually violent crimes"—is at odds with the plain language of the SVP statute, which expressly includes indecency with a child by contact within the definition of a "sexually violent offense." Tex. Health & Safety Code Ann. § 841.002(8)(A); Tex. Penal Code Ann. § 21.11(c)(1). And, while his lack of sexual disciplinary convictions during his most recent period of incarceration certainly does not *support* the jury's verdict, this mere fact does not render the evidence factually insufficient. Instead, the only questions for a jury to answer in a civil commitment trial are whether a person (1) is a repeat sexually violent offender and (2) suffers from a behavioral abnormality that makes that person likely to engage in a predatory act of sexual violence. Tex. Health & Safety Code Ann. §§ 841.003(a), .062(a); *see also Stoddard*, 619 S.W.3d at 678 (holding that a factual sufficiency review based solely on these statutory requirements does not threaten the Act's constitutionality).

We also fail to see how the fact that Jackson "assaulted female family members and that his assaults were many years apart" runs *contrary* to the jury's SVP verdict. Indeed, our sister courts have rejected arguments that a lack of sexually violent recidivism, even during long periods of freedom, is evidence mitigating against an SVP finding, *see In re Commitment of Mendoza*, No. 05-18-01202-CV, 2019 WL 5205710, at *7–8 (Tex. App.—Dallas Oct. 16, 2019, pet. denied) (mem. op.) (rejecting similar factual insufficiency argument that exhibitionist behavior in prison was not "sexually violent"); *In re Commitment of Joiner*, No. 05-18-01001-CV, 2019 WL 4126602, at *9 (Tex. App.—Dallas Aug. 30, 2019, pet. denied) (mem. op.) (holding that evidence of

20

ten-year gap between two sexual offenses when unconfined did not render SVP finding factually insufficient), and have held that the prevalence of ordinary conduct is of limited value in a factual sufficiency analysis because the SVP Act does not require a percentage statement of whether a person is likely to reoffend, and the question is whether there are sufficient indicia that a person has a condition causing predisposition toward violent sexual conduct. *In re Commitment of Ausbie*, No. 14-18-00167-CV, 2021 WL 1972407, at *8 (Tex. App.—Houston [14th Dist.] May 18, 2021, no pet.) (mem. op. on reh'g) (rejecting argument that two offenses over eight years unconfined showed defendant exercised control 99.9993% of the time).

Finally, Jackson identifies one "disputed fact that a reasonable factfinder could not have credited in favor of the verdict[—]that [he] is especially dangerous because he is highly antisocial." Jackson did not offer any evidence as to his antisociality. And while he has pointed to "faulty negative assumptions" made by Dr. Turner in his evaluation and testimony, Jackson incorrectly states that "Dr. Turner found that . . . Jackson had, at worst, the same level of antisociality as an average inmate." Dr. Turner testified that Jackson scored a 22 on the PCL-R, which is what the average inmate would score, and Jackson's "degree of psychopathic traits" is on par with that of an average inmate. The PCL-R test assesses the level of someone's psychopathy, not antisociality.[12] On the specific subject of antisociality, Dr. Turner testified that he

---

[12]Dr. Turner described psychopathy as "a very crystallized version of antisociality."

21

saw "a high degree of antisociality" in Jackson. Further, while Dr. Turner testified that Jackson's level of psychopathy was "right on par with . . . the average inmate," it was "high for a pedophilic offender." Jackson did not dispute this.[13] In short, the assertion that Jackson is especially dangerous because he is highly antisocial was not a "disputed fact that a reasonable factfinder could not have credited in favor of the verdict."

Jackson speculates that "the jury might have found 'behavioral abnormality' based on the fact that [he had] committed horrible sex offenses in his past alone," but the issues before us are limited to whether the evidence is sufficient to support the jury's findings. The jury heard substantial behavioral abnormality evidence, including the expert testimony of Dr. Turner, whose opinion was based on the following facts beyond Jackson's offense history:

- Jackson's feeling at the time he offended was, "I did it, I got away with it, [and] it was exciting."

- When Jackson committed his sexual offenses, "the excitement and the desire to do the sexual act won out over the fear that he was going to go to jail."

- Jackson's sexual abuse of his most recent victim "occurred across time;" he admitted to two incidents, but the victim claimed "that it [had] happened at least five times."

---

[13]We note that, even though the State repeatedly referenced Jackson's antisocial personality traits in closing argument, Jackson did not directly address this subject or even utter the words "antisocial" or "antisociality" in his closing. Of course, what the attorneys say is not evidence; we merely note that Jackson failed to challenge— through evidence *or* argument—what he now on appeal calls a "disputed" fact.

- Jackson was under the influence of alcohol and marijuana at the time of the offenses, and research shows that offenders who offend while under the influence of substances are at an increased risk to reoffend.

- Jackson threatened his third victim in an attempt to keep her from reporting the sexual abuse.

- Jackson had plans to continue abusing his first victim; his abuse of her stopped only because he had entered into a relationship with an adult and had moved to California.

- Jackson's pedophilic disorder has affected his volitional capacity.

- Jackson both exhibits "adult antisocial behaviors" and possesses an antisocial personality, which, according to Dr. Turner, "exponential[ly] increase[s]" the likelihood of Jackson's reoffending.

- Jackson's PCL-R score and "elevated degree of psychopathic traits" are higher than those of most pedophilic offenders.

- Jackson thinks he has merely a substance-abuse problem, not a behavioral abnormality.

- Jackson's deposition testimony indicated a lack of understanding of what he was supposed to learn in sex-offender treatment.[14]

- Jackson has a deviant sexual attraction to young children.

As the factfinder, it was within the province of the jury to weigh the evidence, judge the credibility of the witnesses' testimony, and resolve any conflicts in the evidence. *See In re Commitment of Williams*, 539 S.W.3d 429, 440–41 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *In re Commitment of Stuteville*, 463 S.W.3d 543, 552

---

[14]Dr. Turner elaborated that he did not think that Jackson "ha[d] any sense of what the first thoughts that then lead to the rationalization that then leads to him telling himself it's okay to reoffend are . . . and that's what you're supposed to learn in treatment."

(Tex. App.—Houston [1st Dist.] 2015, pet. denied); *see also Stoddard*, 619 S.W.3d at 668 (stating that, in conducting factual sufficiency review in SVP case, we "may not usurp the jury's role of determining the credibility of witnesses and the weight to be given their testimony"). Additionally, the jury was free to believe all, part, or none of a witness's testimony. *Mullens*, 92 S.W.3d at 887. We may not substitute our judgment for that of the jury. *See Stoddard*, 619 S.W.3d at 677.

We presume that the jury resolved any disputed evidence in favor of its finding that Jackson is an SVP. *See id.* at 668, 674 (stating that we "must presume that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so"). The disputed evidence that a reasonable factfinder could not have credited in favor of the jury's verdict, along with undisputed facts contrary to the verdict, is not so significant in light of the entire record such that the jury could not have found beyond a reasonable doubt that Jackson is a repeat sexually violent offender and suffers from a behavioral abnormality that makes him an SVP. *See id.* at 678. We therefore hold that the State presented factually sufficient evidence to support the jury's finding that Jackson is an SVP. We overrule Jackson's second issue.

## V. Conclusion

Having overruled Jackson's two issues, we affirm the trial court's order of civil commitment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: August 4, 2022